UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division


SHAWN B.,[1]

                          Plaintiff,

v.                                                      Action No. 2:24cv691

FRANK BISIGNANO,
Commissioner of Social Security,

                          Defendant.


<u>UNITED STATES MAGISTRATE JUDGE'S</u>
<u>REPORT AND RECOMMENDATION</u>

Shawn B. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3),

seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security

Administration ("SSA") denying his claim for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 9. Pursuant to the

provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and

Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment, ECF No.

13, be **GRANTED**, and the decision of the Commissioner be **VACATED** and **REMANDED**.

---

[1] Plaintiff's last name has been redacted for privacy reasons.

# I.    PROCEDURAL BACKGROUND

Plaintiff applied for SSI in July 2021.[2] R. 24, 272–80. Plaintiff alleges disability beginning January 1, 2007, due to Crohn's disease. R. 24, 272, 326. After the state agency denied his claim both initially and on reconsideration, R. 190–96, 198–206, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), R. 222. ALJ Carol Matula held a telephonic hearing on June 30, 2023, R. 167–87, and issued a decision denying benefits on August 9, 2023, R. 24–36. On May 2, 2024, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 11–16. As a result, ALJ Matula's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on November 26, 2024. ECF No. 1. In response to the Court's order, plaintiff filed a motion for summary judgment on April 10, 2025, ECF No. 13, and the Commissioner filed a brief in support of the decision denying benefits on May 9, 2025, ECF No. 16. Plaintiff replied on May 23, 2025. ECF No. 17. Plaintiff presents two issues on appeal. First, plaintiff argues that remand is required because the ALJ disregarded plaintiff's need for ready access to a bathroom or time off task to attend to his colostomy bag. Pl.'s Br., ECF No. 14, at 8–14. Second, plaintiff contends that remand is necessary because the ALJ failed to adequately evaluate and explain his credibility finding and that the finding is internally inconsistent. *Id.* at 15–22. As oral argument is unnecessary, this case is ripe for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    *Background Information and Hearing Testimony by Plaintiff*

Plaintiff, who was represented by counsel, testified by telephone before ALJ Matula on June 30, 2023. R. 167–83. Plaintiff was born in August 1974 and was 32 years old at the time of his alleged onset date in 2007 and 48 years old at his hearing in June 2023. R. 272. Plaintiff was single and living in his mother's house at the time of the hearing. R. 172–73. He had a driver's license and drove short distances to the store and gas station. R. 173. He completed the 11th grade in special education classes, which he attended due to his problems with comprehension. *Id.* Plaintiff testified that he remembered to take his medications, could count change at the store, and could read and understand the notices sent to him by SSA. R. 173–76.

Plaintiff has no past relevant work. R. 174. He explained that his work consisted of "little[,] small[,] part-time stuff" and when he tried to work, he would "get sick and lose the job." *Id.*

Plaintiff uses Stelara injections to treat his Crohn's disease, which control the symptoms "okay . . . not really 100%, but . . . a lot better than the last [medication]." R. 174–75. Plaintiff described his Crohn's symptoms as "[c]ramping and loose bowels, diarrhea." R. 175. To the follow-up question of how often he had bowel movements, plaintiff responded "[o]nce a day." *Id.* Plaintiff testified that symptoms of fatigue, stomach cramping, and diarrhea make it difficult to work. R. 181. He experiences stomach cramping every other day that comes and goes and causes severe pain that he rated at 8 out of 10. R. 181–82. Plaintiff estimated that, if he was working, he would need to call out at least three times per week because of Crohn's disease symptoms. R. 182.

Plaintiff has a colostomy bag. R. 177. When asked about problems with the stoma (the opening that allows stools to exit the body), plaintiff stated he has a "little rash" that "comes and

3

goes" and he treats with cream. R. 177–78. Plaintiff testified that he has fistulas in his groin area that make it hard to walk. *Id.* The fistulas were treated with gauze "to keep [them] clean" and a cleanser. R. 178. Plaintiff also testified that he takes Lactulose for constipation, Lisinopril for high blood pressure, and medication for anemia. R. 175.

As to daily activities, plaintiff testified that he is "[b]asically . . . on bedrest because [he] ha[s] a hydrocele"[3] that occurred five or six years earlier. R. 176. The recommended treatment when the swelling is not painful is to elevate the affected area by placing a pillow under his groin. R. 176–77.

Plaintiff sometimes accompanies his mother to the store and sometimes rides an electric cart while there. R. 179. He can carry groceries that are not too heavy and keeps his room straight. R. 179–80. His mother does the housework, cooking, and shopping. *Id.* Plaintiff has a couple of friends who come to see him and they watch television and talk. R. 180–81.

In a function report completed in November 2021, plaintiff stated that he could handle his own personal care except for needing assistance with his shoes. R. 333. He went outside once or twice a day to sit on the porch and his hobbies included reading and doing puzzles. R. 335–36. He rode in the car, did not go out alone because of weakness, and only went out regularly to the doctor. *Id.* He shopped by computer for 30 to 45 minutes each month for medical supplies and clothes. R. 335. He was able to pay bills, count change, handle a savings account, and use a checkbook. *Id.* He talked to others in person, by phone, and by text daily. R. 336. He finished what he started, could pay attention for 20 minutes at a time, got along with authority figures well,

---

[3] A hydrocele is "a type of swelling in the scrotum" that "happens when fluid collects in the thin sac that surrounds a testicle" and "often isn't painful or harmful." Mayo Clinic, *Hydrocele* https://www.mayoclinic.org/diseases-conditions/hydrocele/symptoms-causes/syc-20363969 (last visited Oct. 16, 2025).

and followed written and spoken instructions well, but did not handle stress or changes in routine well. R. 337–38.

Plaintiff identified these symptoms as limiting his ability to work: diarrhea, joint pain, fatigue, and lack of strength. R. 332. His condition affected his ability to lift more than 10 pounds, bend, stand, walk, climb stairs, and complete tasks. R. 337. Plaintiff explained that he could walk 20 to 30 steps before needing to rest for 5 minutes. *Id.* He explained that on a typical day, he gets up and attends to personal needs, eats breakfast, watches television until he gets tired, lays down, gets up for lunch, reads books, eats dinner, and does a word puzzle before going to bed. R. 333. He wakes in the night with stomach pain, cannot stand for a long time, is easily fatigued, uses a cane when he feels really weak, and wants to be alone most of the time. R. 333–34, 336, 338.

## B.    *Hearing Testimony by Vocational Expert*

Christine Slusarski, a vocational expert ("VE"), also testified at the hearing. R. 183–87. In response to the ALJ's first hypothetical[4], VE Slusarski testified that a person with those limitations could perform light work in the national economy, including work as a sorter, office helper, and hand bander (packaging paper products). R. 183–84. VE Slusarski testified that a hypothetical person with the same limitations who was also limited to sedentary work could perform work in the national economy, including work as a sorter, lens inserter, and clerical addresser. R. 184. When asked if those six jobs would remain available if the hypothetical person were limited to never climbing ladders, ropes, and scaffolds and only occasionally performing all other "postural[s]," VE Slusarski clarified that the six jobs would remain available. R. 185. Lastly,

---

[4] The hypothetical prescribed an individual with the same age and experience as plaintiff who is capable of light exertional work with these limitations: (1) stand and walk for four hours a day; (2) occasional climbing, crawling, exposure to unprotected heights, and moving mechanical parts; (3) simple, routine, repetitive tasks not at a production pace rate ("meaning no assembly line type work, no hourly quotas [and work] at a consistent pace throughout the day"). R. 183–84.

VE Slusarski testified that employers would tolerate a maximum of 10% of time off task during the workday and would tolerate one absence per month. *Id.*

### C.    *Relevant Medical Record*

#### 1.    *Gastroenterologist Mark Dubinski, M.D.—March 2, 2021*

Mark Dubinski, M.D., a gastroenterologist, assessed plaintiff's Crohn's disease on March 2, 2021. R. 564. Dr. Dubinski noted that plaintiff was last seen in the clinic in April 2020. *Id.* Dr. Dubinski reviewed plaintiff's record, including a 2018 colonoscopy that showed plaintiff's Crohn's was in remission. *Id.* He also reviewed a more recent abdominal CT, small intestine bowel follow-through, and upper endoscopy all of which showed no significant pathology. *Id.* Plaintiff reported that he had stopped taking his Entyvio injection (a biologic medication) because of malaise, fatigue, and weight loss. *Id.*; *see also* R. 501–02, 521, 582, 604, 620 (records documenting plaintiff's refusal to take his Entyvio shot every eight weeks from July 2020 through March 2021). Dr. Dubinski was "dismayed" that plaintiff had stopped the medication "without real reason." R. 564.

Plaintiff had "somatic complaints" of "not feeling well and vague abdominal discomfort." *Id.* There was no blood in his colostomy bag and soft, well-formed stool. *Id.* Dr. Dubinski found there was "little to support disease activity" and plaintiff was "likely in remission." *Id.* He directed plaintiff to continue taking Mesalamine and to return in six months. *Id.*

#### 2.    *Emergency department visits and admission to hospital*
#### a.    **Bon Secours Maryview Medical Center—August 20, 2021**

Plaintiff was brought into the Maryview Medical Center emergency department in Portsmouth, Virginia at 5:30 a.m. on August 20, 2021, by a Portsmouth medic. R. 680. Plaintiff had a sudden onset of sharp, non-radiating, epigastric pain (moderate to severe) that woke him from sleep and caused shortness of breath. *Id.* Plaintiff had non-bloody diarrhea in his colostomy

bag the previous day with two episodes of vomiting. *Id.* Bloodwork was taken and an abdominal and pelvic CT was performed. R. 683. This testing revealed "multiple loops of dilated small bowel . . . suggestive of either ileus or developing partial small bowel obstruction" and "slight thickening of the small bowel at the anastomotic site," as well as "multiple renal hypodensities." R. 700–04. Jonathan Kinzer, M.D., determined plaintiff's condition was not urgent, prescribed a liquid diet, and discharged plaintiff at 10:45 a.m. with instructions to return if his symptoms worsened. *Id.*

### b.    Sentara BelleHarbour—August 20, 2021

That evening, at 8:30 p.m., plaintiff presented to the emergency department at Sentara BelleHarbour in Suffolk, Virginia, with abdominal pain. R. 951–52. Plaintiff reported nausea and vomiting but no blood in his colostomy bag. R. 953. Plaintiff had a normal abdominal exam— soft, no distension, no tenderness—his white blood count was 15.5, down from 20 while at Maryview Medical Center, and his other test results were within normal limits. R. 952–54. After he was given Solumedrol, Dilaudid, Zofran, and intravenous fluids, plaintiff was feeling "much better." R. 952. Plaintiff was discharged at 1:00 a.m. on August 21, 2021, with a course of Prednisone and was instructed to return if his symptoms worsened. R. 952, 956.

### c.    Sentara Norfolk General Hospital—August 21 through 28, 2021

Plaintiff presented to the emergency department at Sentara Norfolk General Hospital in Norfolk, Virginia, approximately nine hours later, at 10:00 a.m. on August 21, 2021, with complaints of abdominal pain and concerns of a Crohn's flare. R. 887–951. An examination revealed diffuse, generalized tenderness with no rebound. R. 888. Plaintiff reported vomiting his medications, worsening symptoms, and no stool in his colostomy bag. R. 889. A second CT of plaintiff's abdomen and pelvis revealed results similar to those of the prior day. R. 892. Plaintiff

was admitted for management of his Crohn's flare and partial small bowel obstruction. R. 896–97, 943. Steroids were administered through an IV and a nasogastric ("NG") tube was placed in an effort to decompress the ileus.[5] R. 897, 908, 936.

On August 26, 2021, the NG tube was removed, a clear liquid diet was introduced, and a course of Prednisone was prescribed. R. 930, 936. Plaintiff started a normal diet on August 27, 2021, and was discharged on August 28, 2021. R. 940, 943. At discharge, plaintiff was feeling better, eating about half of his diet, having good bowel function, and follow up was arranged with a gastroenterologist. R. 943, 951.

### d.    Sentara Norfolk General Hospital—January 2, 2022

Plaintiff went to the emergency department at Norfolk General Hospital at 10:00 a.m. on January 2, 2022, with shortness of breath on exertion for two weeks, abdominal discomfort, bloating, and decreased ostomy output with nausea. R. 877–85. Plaintiff reported recently switching from steroids to Pentasa. R. 879. Plaintiff was treated with a gastrointestinal ("GI") cocktail, Zofran, and antibiotics. R. 878, 883. His examination was normal and blood work was unremarkable except for a mildly elevated D-dimer (a blood test that measures a protein fragment released when a blood clot breaks down). R. 882. A CT of plaintiff's abdomen and pelvis revealed "[f]luid filled small bowel loops" with "[n]o associated wall thickening" that "could reflect enteritis" while a "[v]ery early/developing partial obstruction or ileus [was] possible but far less likely." R. 885. Plaintiff was discharged in stable condition at 8:30 p.m. *Id.*

---

[5] While in the hospital, plaintiff received Tylenol, Colase, Dilaudid, OmniPaque, Normodyne, Lactulose, Activan, Prednisone, Lopressor, Zofran, Protonix, and Miralax. R. 915.

### 3.    *Gastrointestinal and Liver Specialists of Tidewater*

On September 20, 2021, plaintiff began treatment with Anant S. Damle, M.D., and Keisha Thigpen, PA-C, with Gastrointestinal and Liver Specialists of Tidewater ("GLST"). R. 1477. Notes indicate that plaintiff's Crohn's disease was complicated about 20 years prior by an enteral fistula (an abnormal connection between two parts of the GI tract) resulting in a colectomy (removal of part of the colon) and proctectomy (removal of the rectum). R. 1640. Plaintiff was last seen at GLST in 2014.[6] R. 1472. Plaintiff's September 2021 lab results were "concerning" with a white blood count of 15.5, but were otherwise normal. *Id.* Plaintiff reported constipation, gas, and stomach cramps, but no abdominal pain, diarrhea, or nausea. R. 1477–78. Plaintiff also reported eating solids and taking Lactulose without diarrhea. R. 1477. Plaintiff's examination was normal with a soft, non-tender abdomen, normal bowel sounds, and a colostomy that was in place. R. 1479. Dr. Damle ordered a colonoscopy, prescribed Stelara, and directed plaintiff to continue taking Prednisone until his Stelara was approved, eat a low residue diet, and follow up in one month. R. 1480.

On November 17, 2021, John Lawson, M.D., performed a colonoscopy on plaintiff. R. 1474–75. Plaintiff's physical examination performed before the procedure was normal. R. 1475.

---

[6] Plaintiff was admitted to Sentara Obici Hospital on January 24, 2014, for an exacerbation of his Crohn's disease with perianal fistulae. R. 974–1030. Plaintiff reported that his symptoms had previously been controlled by Remicade infusions, but that he had not received these in two to three months. R. 975. An abdomen and pelvis CT revealed chronic perirectal fistula tracts, fluid filled small bowel loops (with no significant wall thickening or transition point) that may represent an ileus, mild enteritis, or partial small bowel obstruction, as well as a large left and moderate right hydrocele. R. 1004. Plaintiff was administered pain medication, steroids, and a Remicade infusion. R. 1016, 1024. Plaintiff was discharged from the hospital one week later on January 31, 2014, and was prescribed Remicade injections. R. 1024, 1030. While this occurred well before the 12-month period preceding plaintiff's July 2021 application, it helps to give context to plaintiff's condition. *See* 20 C.F.R. § 416.912(b) (explaining ALJ's have a duty to consider a plaintiff's complete medical history for at least the 12 months preceding the month in which the application for SSI was filed).

Plaintiff's abdomen was soft with normal bowl sounds and non-tender, with evidence of "old extensive midline surgical scars," and a colostomy appliance in its proper place. *Id.* Plaintiff's rectal exam showed no external lesions, hemorrhoids, tags, masses, or tenderness and he had normal sphincter tone. *Id.*

The digital exam was normal and the colonoscope revealed nothing remarkable. *Id.* Plaintiff's poor preparation before the examination limited visualization, but there was "no apparent active disease to 30cm." *Id.* Dr. Lawson noted that he would consider starting Stelara after a CT enterography (an imaging procedure using a CT scanner and oral contrast liquid to provide images of the small intestine) and directed plaintiff to begin tapering Prednisone. R. 1475–76.

On December 1, 2021, plaintiff's primary care physician referred him to GLST because of an inflamed ostomy. R. 1492, 1533–34 (noting a four-inch protrusion). Dr. Neuman with GLST noted that plaintiff's ostomy was "mildly edematous." R. 1492. Plaintiff was tapering off Prednisone, and reported no abdominal pain, fatigue, nausea, constipation, diarrhea, or stomach cramps, though he did report gas and bloating. R. 1492–93. His examination was normal. R. 1494. On December 15, 2021, Dr. Damle observed that plaintiff's ostomy was in place without complication. R. 1488. Plaintiff reported a good appetite and no abdominal pain, constipation, diarrhea, or stomach cramps. R. 1488–89. His examination was normal. R. 1490. Plaintiff had been approved for Stelara and his initial IV induction was scheduled for December 27, 2021. *Id.* Dr. Damle directed plaintiff to start Stelara, finish his Prednisone, and follow up in three months. *Id.*

In March and June 2022, plaintiff reported to Dr. Damle that he was taking Stelara every eight weeks and that he had no abdominal pain or diarrhea. R. 1481, 1484. He reported chronic

constipation and Dr. Damle adjusted his Lactulose prescription. R. 1481–83. Plaintiff's abdominal examinations were normal on both occasions. R. 1483, 1486.

In September 2022, Dr. Damle conducted another colonoscopy. R. 1500. The digital exam was normal, but an ileo-colonic anastomotic stricture was found with the colonoscope. *Id.* Dr. Damle noted that plaintiff may need surgical versus endoscopic correction of the stricture. R. 1501. Plaintiff was directed to follow up in three months. *Id.*

In January 2023, plaintiff had abdominal swelling without pain. R. 1641. Dr. Damle noted that plaintiff was on Stelara every eight weeks without any breakthrough ulcerative colitis ("UC") symptoms and his bowel function was doing well on Lactulose. R. 1640. He also noted that plaintiff self-administers monthly B12 injections that help his energy levels. *Id.* Plaintiff's abdominal examination was normal and he was directed to continue his Stelara injections. R. 1641–42.

On March 28, 2023, the last record from GLST, PA-C Thigpen ordered an MRI of plaintiff's abdomen and pelvis. R. 1637.

### 4. *Family Medical Health Center*

On October 11, 2021, plaintiff had his first visit with Samir Abdelshaheed, M.D., and Robin Lebo, NP, with the Family Medical Health Center. R. 1546–48. Plaintiff relayed that his abdominal pain was constant and severe, but denied weight loss, weakness, or lightheadedness. R. 1546. Plaintiff's abdominal examination was normal (soft, nontender, with no rigidity or guarding). R. 1547. Plaintiff explained that he was not currently treating his Crohn's disease and discussed starting Remicade. R. 1548. During an office visit on October 25, 2021, plaintiff's white blood count was elevated (16.9), he was taking steroids to treat his Crohn's disease, and he was prescribed Tramadol for pain. R. 1541–43.

11

On November 15, 2021, while getting medications refilled and receiving treatment for hypertension, plaintiff complained to NP Lebo of abdominal pain. R. 1535. NP Lebo referred plaintiff to pain management, explaining that she could not refill his Tramadol prescription because he tested positive for Oxycontin. R. 1537.

On November 30, 2021, while receiving treatment for hyperlipidemia, NP Lebo examined plaintiff's abdomen. R. 1533. She noted that plaintiff's ostomy was inflamed, extremely swollen, and "protruding about [four] inches." R. 1533–34. She called and scheduled plaintiff's December 1, 2021, appointment with GLST. R. 1534. Plaintiff's ostomy remained swollen on December 14, 2021, appearing the same as it had at the last appointment, and Dr. Abdelshaheed noted that plaintiff had an appointment with GLST the next day. R. 1530–31.

On February 1, 2022, NP Lebo noted that plaintiff had started treating his Crohn's with Stelara with no adverse side effects. R. 1528. Plaintiff received treatment for hyperlipidemia and anemia in March and April 2023. R. 1518–20, 1655–58. While the March notes continue to indicate a swollen ostomy, this had resolved by April, with no further discussion of Crohn's symptoms or treatment. R. 1519, 1656.

### 5.    *Opinions of State Agency Experts*

In connection with plaintiff's physical residual functional capacity ("RFC"), Robert McGuffin, Jr., M.D., reviewed plaintiff's medical record and opined in July 2022 on initial review that plaintiff could: (1) occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; (2) stand and/or walk, with normal breaks, for 4 hours in a day; (3) sit, with normal breaks, for about 6 hours in an 8-hour workday; (4) occasionally crawl and climb ladders, ropes, and scaffolds; and (5) was not limited in his ability to stoop, kneel, crouch, balance, and climb ramps and stairs. R. 194. Dr. McGuffin explained that plaintiff's exertional and postural limitations were

due to his history of Crohn's disease, hypertension, and GERD. *Id.* Dr. McGuffin did not find plaintiff to have any manipulative, visual, communicative, or environmental limitations other than needing to avoid concentrated exposure to hazards such as heavy machinery and unprotected heights. R. 194–95. Further, Dr. McGuffin explained that plaintiff was capable of a limited range of light work due to his history of Crohn's disease with a prior partial colectomy with ostomy, diarrhea, joint pain, fatigue, lack of strength, and use of a cane when weak. R. 195.

On reconsideration, William Humphries, Jr., M.D., concurred in November 2022 with Dr. McGuffin's opinions. R. 202–03.[7] In addition to the explanation offered by Dr. McGuffin, Dr. Humphries added that plaintiff had a normal gait with 5/5 strength but occasional weakness due to Crohn's disease and hypertension with chest pain. R. 204. Dr. Humphries affirmed Dr. McGuffin's finding that plaintiff can perform a limited range of light work "based on the new information that has been provided." *Id.*

### III.    THE ALJ'S DECISION

To evaluate plaintiff's claim of disability, the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 416.920(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work given his RFC; and (5) was capable of engaging in any substantial gainful employment given his RFC. R. 27–36.

---

[7] No state agency examiner reviewed plaintiff's mental impairments and it was noted that "[n]o [mental] RFC's are associated with [plaintiff's] claim." R. 195, 205.

First, the ALJ determined that plaintiff had not engaged in substantial gainful activity since July 26, 2021, the application date. R. 27.

At steps two and three, the ALJ found that plaintiff's Crohn's disease and status post-right hemicolectomy with colostomy constituted severe impairments. *Id.* The ALJ classified plaintiff's other impairments as non-severe, including his status post partial small bowel obstruction, hypertension, hyperlipidemia, thrombocytopenia, leukocytosis, vitamin D deficiency, anemia, gastroesophageal reflux disease, mild degenerative joint disease, and borderline obesity. R. 27– 28. The ALJ determined that plaintiff's severe impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 28–29.

The ALJ found that plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were "not fully consistent with the evidence." R. 32. The ALJ noted that the objective examinations indicate normal to moderate findings overall, plaintiff has been noncompliant with treatment at times, and plaintiff's Crohn's disease has improved overall and is generally well controlled with treatment. R. 33. The ALJ next found that plaintiff possessed the RFC to perform light work as defined in 20 C.F.R. § 416.967(b). R. 29–35. The ALJ specified the following additional limitations: (1) only stand and walk four hours a day; (2) occasionally climb, crawl, and be exposed to unprotected heights and moving mechanical parts; and (3) only "simple, routine, repetitive tasks, not at a production pace rate, meaning no assembly line type work, no hourly quotas, and work is done at a consistent pace throughout the day." R. 29–34.

At step four, the ALJ noted that plaintiff has no past relevant work. R. 34. After reviewing the Dictionary of Occupational Titles ("DOT") and the VE's testimony, at step five the ALJ determined that plaintiff could perform existing jobs in the national economy, including working

as a sorter, office helper, and hand bander. R. 35. Accordingly, the ALJ concluded plaintiff was not under a disability from July 26, 2021 (the date the application was filed), through August 9, 2023 (the date of the opinion), and was ineligible for SSI. R. 36.

## IV.    STANDARD OF REVIEW

In reviewing an ALJ's decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Thus, reversing the denial of benefits is appropriate only if either

15

(1) the record is devoid of substantial evidence supporting the ALJ's determination, or (2) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

Plaintiff presents two issues on appeal.  First, plaintiff argues that remand is required because the ALJ failed to include plaintiff's need for ready access to a bathroom or time off task to attend to his colostomy bag in plaintiff's RFC. Pl.'s Br. 8–14. Second, plaintiff contends that remand is necessary because the ALJ failed to adequately evaluate and explain his credibility finding and that the finding is internally inconsistent. *Id.* at 15–22. The Court will address each argument in turn.

### A.    *The ALJ did not err in failing to include ready access to the bathroom and time off task to attend to the colostomy bag in plaintiff's RFC.*

Plaintiff contends that the ALJ "erred as a matter of law by failing to consider plaintiff's need for ready access to a bathroom or time off task to tend to and clean his colostomy bag." Pl.'s Br. 8.  Without citation to the record, plaintiff asserts,

> [t]he use of a colostomy bag requires regular maintenance for cleaning the skin around the stoma, emptying of the ostomy bag, and changing or cleaning the pouch. This may result in the need for ready access to a nearby restroom, additional and/or unscheduled breaks, and time off task in a work setting.

*Id.* at 10. Plaintiff asserts the ALJ erred in failing to account for this in the RFC. *Id.* at 10, 13. Plaintiff argues the ALJ's error was not harmless because the VE testified that employers tolerate a maximum of 10% time off task in addition to regular breaks and the VE identified jobs that may occur in a factory or large facility where plaintiff's workstation may be located far from a bathroom. *Id.* at 13–14.

The Commissioner contends the ALJ reasonably considered plaintiff's GI issues and symptoms and found plaintiff's limitations are compatible with normal breaks and time off task

16

allowed by employers.  Def.'s Br. in Supp. of the Comm'r's Decision Denying Benefits and in Opp'n to Pl.'s Mot. Summ. J. ("Def.'s Br."), ECF No. 16, at 14–17.

The ALJ noted that plaintiff has a colostomy bag and considered plaintiff's testimony that he has constipation, fatigue, bowel movements once a day; stomach cramping every other day; diarrhea every other day; and would need to call out of work at least three times each week because of symptoms from his Crohn's disease.  R. 30.  Plaintiff did not testify that he needed ready access to a bathroom or time off task to tend to and clean his colostomy bag and does not cite to medical records addressing these issues.

Plaintiff cites several cases in support of this argument.  In each of the cases, however, plaintiff's testimony or medical records conveyed that the GI-related symptoms required additional unscheduled breaks or proximity to a bathroom.  In *Dowling v. Commissioner of Social Security Administration*, the Fourth Circuit remanded the case because the ALJ relied on an incorrect regulatory framework that led to an erroneous RFC assessment.  986 F.3d 377, 388 (4th Cir. 2021).  In doing so, the court noted the following aspects of the ALJ's RFC analysis were "particularly troubling."  *Id.*  There was "considerable evidence in the record" that the claimant experienced diarrhea, incontinence, and drainage from her anal fissure that caused her to require bathroom breaks "at a frequent and, often unpredictable, rate."  *Id.* at 389.  In addition, the claimant argued throughout her administrative proceeding that her irritable bowel disease and anal fissure caused discomfort when she sat for prolonged periods.  *Id.* at 388.  The Fourth Circuit noted the claimant would likely have been incapable of sedentary work if she could not sit for prolonged periods of time or if she needed to visit the bathroom many times throughout the day and instructed the ALJ to address these issues under the appropriate regulatory framework on remand.  *Id.* at 389.

In *Cale T.M. v. Saul*, plaintiff testified that he would need to drink 6 or 7 liquid meals during a normal workday, which took 10 to 15 minutes to mix and 10 to 15 minutes to consume. No. 3:20cv70, 2021 WL 3560229, at *9 (E.D. Va. July 22, 2021). His father's testimony confirmed the time needed to prepare and consume the liquid diet and the VE testified that plaintiff's need to drink six or seven meals during the workday would be work preclusive. *Id.* The ALJ credited the father's testimony and cited plaintiff's testimony about the liquid diet, but failed to include a limitation for unscheduled breaks in the RFC or explain why the VE's testimony was not dispositive. *Id.* The court remanded to allow the ALJ to consider whether the liquid diet was work preclusive or explain why the liquid diet did not result in a limitation to the RFC. *Id.* at *10.

In *Anders v. Colvin*, despite "graphic testimony" about plaintiff's GI disorders and medical records indicating he was hospitalized "fairly frequently" as a result of the disorders, the ALJ found the disorders non-severe and, aside from acknowledging that plaintiff had "stomach problems that include a ruptured esophagus," did not discuss plaintiff's GI symptoms or how they affected his RFC. No. 1:13cv284, 2015 WL 4656291, at *5 (W.D.N.C. Aug. 6, 2015). The case was remanded for the ALJ to explain how plaintiff's GI disorders affected his RFC. *Id.*; *see also Warren v. Astrue*, No. 1:09cv230, 2011 WL 5299691, at *5–6 (W.D.N.C. Nov. 3, 2011) (remanding because the ALJ failed to consider several severe impairments at step three, including that the claimant was incontinent, which required that she stay close to a bathroom and take frequent, unscheduled breaks).

Here, plaintiff has pointed to no evidence in the record to support the argument that he needs ready access to the bathroom or unscheduled breaks to tend to his colostomy bag. Nor did plaintiff testify that he needed these accommodations. Plaintiff's argument that the ALJ erred by failing to include these limitations—that were not established in the record—is not persuasive.

Plaintiff asserts the ALJ erred by failing to ask him questions about how much time, and how often, he needed to attend to his colostomy bag. Pl.'s Br. 14. The Court notes plaintiff was represented by counsel at the hearing, and his counsel did not pursue this line of questioning. R. 181–83. The ALJ asked plaintiff if he had any problems with the stoma and plaintiff responded that he had a rash "off and on" that he treated with cream. R. 177–78. In response to counsel's question about what symptoms would preclude work, plaintiff responded fatigue, stomach cramping, and diarrhea. R. 181–82. Plaintiff did testify that he would need to call out of work at least three times each week due to his Crohn's symptoms. R. 182. This testimony is addressed in the next section. Despite these questions, plaintiff did not mention needing ready access to the bathroom or extra breaks. Accordingly, the ALJ did not err by failing to include proximity to the bathroom and a need for unscheduled breaks to attend to the colostomy bag in plaintiff's RFC.

**B.    *The ALJ erred in failing to adequately evaluate and explain his credibility analysis.***

Next, plaintiff asserts the ALJ erred by failing to adequately evaluate plaintiff's credibility regarding his Crohn's symptoms and by formulating a credibility analysis that is internally inconsistent. Pl.'s Br. 15. The Commissioner argues that the ALJ appropriately analyzed plaintiff's subjective allegations and explained her reasons for finding that some of plaintiff's allegations were not credibly established. Def.'s Mem. 10–14.

To evaluate plaintiff's subjective reports of pain and other symptoms, an ALJ must follow the two-step analysis set forth in 20 C.F.R. § 416.929 and detailed further in Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (Mar. 16, 2016). *See, e.g.*, *Arakas v. Comm'r Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020). At step one, an ALJ decides whether there is "objective medical evidence" of a medical impairment that "could reasonably be expected to produce the pain or other

symptoms alleged" by a claimant.[8] 20 C.F.R. § 416.929(a). If, as here, an ALJ finds that such an impairment exists and could reasonably be expected to cause the symptoms identified by a claimant, the analysis moves to step two. *See* R. 30. At step two, an ALJ assesses the intensity and persistence of a claimant's reported symptoms to decide how they affect that person's capacity to work. 20 C.F.R. § 416.929(c). In doing so, an ALJ is required to consider all the evidence, including objective medical evidence and other evidence such as a claimant's statements and information provided by non-medical and medical sources, including state agency personnel. *Id.* § 416.929(c)(1)–(3); SSR 16-3p, 2016 WL 119029, *4–7. Factors bearing upon an ALJ's assessment of a claimant's symptoms to be considered include: daily activities; the intensity, frequency, and duration of such symptoms; precipitating and aggravating factors; the type, dose, and utility of any medication taken to treat symptoms; the use of other treatments to address symptomology; and any other measures used by a claimant to relieve symptoms. *See* 20 C.F.R. § 416.929(c)(3)(i)–(vii).

As some symptoms, such as pain, "cannot always be confirmed by objective indicia," *Craig*, 76 F.3d at 595, the Fourth Circuit has recognized that objective medical evidence of a claimant's symptoms is not required at step two to find a claimant disabled, *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 360 (4th Cir. 2023); *Arakas*, 983 F.3d at 95 (citing SSR 16-3p, 2016 WL 1119029, at *4–5). As noted in SSR 16-3p, an ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms *solely* because the

---

[8] "Objective medical evidence" is defined as "medical signs, laboratory findings, or both." 20 C.F.R. § 416.913(a)(1). Medical "signs" include "anatomical [and] physiological . . . abnormalities that can be observed, apart from [a claimant's] statements (symptoms) . . . [and] must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 416.902(g). "Laboratory findings" include "anatomical [and] physiological . . . phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques . . . includ[ing] . . . blood tests[,] electrophysiological studies . . . , [and] medical imaging. *Id.* § 416.902(c).

objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." 2016 WL 1119029, at *5 (emphasis added) (adding that a report of "minimal or negative findings . . . in the objective medical evidence is one of many factors" to be considered); *see Shelley C.*, 61 F.4th at 361–62 (noting that ALJ's insistence that subjective symptoms be validated by objective evidence erroneously increased a claimant's burden of proof).

The foregoing guides the Court's review of the current dispute about the ALJ's step two analysis of plaintiff's Crohn's disease symptoms. The ALJ found that: (1) plaintiff's Crohn's disease and status post-right hemicolectomy with colostomy could reasonably be expected to cause his alleged symptoms (step one); but (2) plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are *not entirely consistent* with the medical evidence and other evidence in the record" (step two). R. 30 (emphasis added). The ALJ summarized certain medical records, outlined plaintiff's testimony and function report, including plaintiff's allegations of diarrhea, stomach pain, cramping, constipation, and fatigue, which would require his calling out of work at least three times a week due to his symptoms from Crohn's disease. R. 30–33. The ALJ noted plaintiff's "numerous ED visits with complaints of abdominal pain among other things." R. 33 (citing all emergency department records).

The ALJ then found:

> [t]he objective examinations, including PEs, CT scans, and GI examinations, indicate normal to moderate findings overall. In addition, the claimant has been noncompliant with treatment, including medications, at times. Furthermore, the claimant's Crohn's disease has improved overall with treatment, including medications and injections, and it is generally well controlled with treatment, including medications and injections.

*Id.* (citations omitted).

The step two analysis is problematic because the ALJ failed to address certain prominent portions of plaintiff's medical record when conducting the analysis. The ALJ referenced generally

21

"numerous ED visits with complaints of abdominal pain among other things," *id.*, and discussed the Maryview Medical Center records from August 20, 2021, finding that "there was no indication for urgent intervention" and directing plaintiff to continue with a mostly liquid diet and return if symptoms worsened, R. 31 (citing records from Maryview Medical Center). The ALJ outlined results from a CT scan performed August 20, 2021, at Maryview Medical Center. *Id.* (citing records from Maryview Medical Center and a record from Norfolk General Hospital restating findings from the CT performed at Maryview Medical Center).

The ALJ does not discuss, however, plaintiff's visit to Sentara BelleHarbour later the same evening, for abdominal pain. R. 951–52. More importantly, the ALJ does not address plaintiff's admission to Norfolk General Hospital the next day, August 21, 2021, for treatment of his Crohn's flare, and that plaintiff remained in the hospital for seven days until his discharge on August 28, 2021. R. 887–951. During this week-long hospital stay, a NG tube was placed in an attempt to decompress his ileum and get his Crohn's flare under control. R. 917, 930. Referencing "numerous ED visits with complaints of pain," while citing to all ED records, is not enough to indicate that the ALJ considered plaintiff's week-long hospital stay. R. 33.

The ALJ also discussed plaintiff's March 2021 examination by Dr. Dubinski, a gastroenterologist, who reviewed a 2018 colonoscopy showing plaintiff's Crohn's disease was in remission, reviewed a more recent CT showing no significant pathology, noted dismay that plaintiff discontinued his Crohn's medication, and found plaintiff was "likely in remission" as there was "little to support disease activity." R. 30–31, 564. Yet the ALJ failed to address the colonoscopy performed in September 2022. R. 1500–01. The colonoscopy revealed an ileo-colonic anastomotic stricture (a narrowing at the site where the small intestine was surgically joined to the colon) that Dr. Damle noted may require surgical versus endoscopic correction. *Id.*

22

The Court acknowledges that ALJs are not required to address every piece of evidence in the medical record. *See* 82 Fed. Reg. 5844-01, at 5858 (discussing adoption of a "reasonable articulation standard" that "does not require written analysis about how [an ALJ] considered each piece of evidence"). Here, however, where plaintiff's claim for disability centers around symptoms from Crohn's disease, his seven-day hospital stay for a Crohn's flare and recent colonoscopy indicating he may need surgery to address a stricture, are highly relevant parts of the medical record that needed to be considered by the ALJ. The ALJ may have made the same findings—the objective examinations "indicate normal to moderate findings overall," and plaintiff's Crohn's disease "has improved overall with treatment"—after considering the hospital stay and recent colonoscopy results. *See* R. 34. If so, the ALJ may ultimately reach the same conclusion—plaintiff's disability reports, function report, and hearing testimony relating to his symptoms "are not fully supported by and not fully consistent with the objective clinical and diagnostic findings." *Id.* The Court cannot, however, make this determination without knowing whether the ALJ even considered these important pieces of plaintiff's medical record.

The ALJ relied on a selective reading of the record to find plaintiff's statements about his limitations due to Crohn's symptoms were not fully consistent with the evidence. R. 30–32. As a result, the ALJ did not account for plaintiff's stated limitations in the RFC, including plaintiff's assertion that he would need to call out of work at least three times each week due to Crohn's symptoms. R. 32–33. Because the ALJ failed to account for some of the most important medical records addressing plaintiff's Crohn's disease, the seven-day hospital stay to treat his Crohn's flare and his most recent colonoscopy revealing a stricture that may need surgical intervention, the Court cannot find substantial evidence to support the ALJ's credibility finding or resulting RFC.[9]

---

[9] Given this conclusion, no need exists to address plaintiff's other claims of error.

## VI.    RECOMMENDATION

For these reasons, the Court recommends that plaintiff's motion for summary judgment, ECF No. 13, be **GRANTED**, and the decision of the Commissioner be **VACATED** and **REMANDED**.

## VII.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within 14 days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra 3 days, if service occurs by mail.  A party may respond to any other party's objections within 14 days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
October 23, 2025